[Opinion delivered February 10, 1886.]

---

[No. 1950.]

## Stephen Herron *v.* The State.

Theft — Charge of the Court. — Evidence in a theft case which tends to negative the connection or complicity of the accused with the original taking of the stolen property demands of the trial court a charge to the effect that if the jury believe from the evidence that the accused was not connected with the original taking, he should be acquitted. See the opinion *in extenso* for a state of proof which demanded such a charge, and note also the special charges which, presenting the law upon the subject, were erroneously refused. The verity and weight of the evidence were for the determination of the jury alone.

APPEAL from the District Court of Guadalupe. Tried below before W. E. Goodrich, Esq., Special Judge.

The indictment in this case charged the appellant and one Joe Williams, jointly, with the theft of a beef-steer, the property of William Gay, in Guadalupe county, Texas, on the 21st day of April, 1877. The appellant was brought to trial alone, at the November term, 1885, of the district court, and was convicted, his punishment being assessed at a term of three years in the penitentiary.

William Saffold was the first witness for the State. He testified that on one Sunday night in April, 1877, Sidney George came to his house, and requested witness to go with him to defendant's house in search of his, George's, cow. Witness collected a party consisting of S. J. Dixon, Sidney George, P. C. Barrington, Strother Wooldridge, and several others whose names witness could not now recall, and they arrived at defendant's house about daylight. They found Mrs. Herron at home, but the defendant was not to be found. The premises were then searched. In the defendant's smoke house were found the four quarters of a beef which had evidently been slaughtered during the night. In the garden, and at the corner of the fence, some ten or fifteen feet distant from the smoke house, was found the fresh hide of a beef, carefully folded. The head of a beef was found in the defendant's hog pen, and the entrails were found in a small brush pen. The head and hide were taken into the defendant's yard for examination. The hide was found to bear the brand of William Gay, and not that of Sidney George. Gay was sent for, and upon his arrival he identified the head and hide as the remains of one of his beef steers. The party looked for, but failed to find the defendant's horse or saddle. They found the point in the defendant's field where a horse had been staked during the night, and followed the tracks of the same across the field and over three fences which had evidently been hastily thrown down low enough for a horse to clear them by jumping. The defendant owned the place on which he then resided. His family continued to occupy the premises, but witness saw nothing of the defendant until the expiration of two or three years after the occurrence narrated. Witness was at that time the president of a stock association which was organized in Guadalupe county to protect the stock interests of citizens from the depredations of thieves. No colored man belonged to that association, but the protection of the association was extended to colored stock owners, as in this instance, as readily and as rigidly as to whites. Mr. Duggan was a member of

that association, but, if he was an especial terror to the colored people, witness did not know it. William Gay, having identified the head and hide, was permitted to take the four quarters of the beef found in the smoke house. Defendant's wife was the only person at the defendant's house during the visit of the witness and his party. General Saffold's testimony was corroborated in detail by P. C. Barrington.

Strother Wooldridge, for the State, corroborated the testimony of the witnesses Saffold and Barrington, and in addition testified that Buck Franklin came to his house on the night of the alleged theft, and communicated certain facts to him which prompted him to keep watch during the remainder of the night, on one side of the defendant's premises, to detect, if possible, any one leaving or going to the defendant's house. No one went to the defendant's house or left it, on that side watched by witness. He, of course, could not say what happened on the opposite side which he could not see. Witness lived within a half mile of the defendant and had known him for years. Several years elapsed after the night in question before the witness again saw the defendant, during which time defendant's family continued to reside on the place. While examining the premises witness found cattle tracks leading from the cow-pen through, and to the back part of the field where the fence appeared to have been thrown down.

William Gay testified, for the State, that, being summoned to defendant's house on the morning after the beef was killed, he was shown the hide and head of an animal which he promptly and fully recognized as the hide and head of a two-year-old steer which belonged to him, and which had been taken and killed in Guadalupe county without his knowledge or consent.

Buck Franklin testified, for the State, that while he was at the house of Sam Freeman, in Guadalupe county, about sundown one Sunday evening in April, 1877, he saw the defendant driving a bunch of cattle towards his, defendant's, home. Among the cattle witness recognized a belled cow which belonged to Sidney George, and the red and black animal described in the indictment. Witness went immediately to George's house and told him what he had seen. Witness and George then went to reconnoitre defendant's premises to discover, if possible, what he purposed doing with the cow. Arriving at a point near the house, George concealed himself behind a bush, and witness walked up to the defendant's yard fence and called defendant's name three times. At the first call witness heard a noise which he thought was made by some one leaping the cow-

pen fence. Witness then looked into the cow-pen and saw what he took to be a skinned beef lying on the ground. Within a moment or two the witness saw the defendant approaching the house on the yard side of the fence, and coming from the direction in which the noise described was made. Defendant answered witness's third call, by asking who witness was. Witness replied, giving his name. Defendant asked what witness wanted. Witness replied that he wanted to borrow his wagon for the purpose of hauling bones. The defendant replied that his wagon had no bed, would not do for the purpose, and that witness could not get it. Defendant stopped a short distance from the fence which separated him from witness, and witness observed that his shirt sleeves were rolled up to his elbows. Witness saw some animals in the cow-pen, but did not go into the pen to examine, for fear that the defendant would suspect the real purpose of his visit. Witness left without further delay. Sidney George went to get General Saffold, and witness went to get Strother Wooldridge. He got Wooldridge to watch one side of defendant's premises until the arrival of General Saffold, to examine into the suspicious transactions at the house. The house of old man Freeman, who was a blind man, stood about a quarter of a mile distant from defendant's house, and was the only house between defendant's house and the cattle range in that direction.

Sidney George, for the State, corroborated the statement of Buck Franklin up to the time that they separated near defendant's house, witness to get General Saffold, and Franklin to get Wooldridge. He testified that he went to General Saffold's house and got him, and he detailed the subsequent occurrences substantially as did Saffold. The State closed.

Lotta Herron, the daughter of the defendant, was his first witness. She testified that her father and mother left home early one Sunday morning in April, 1877, leaving herself and a girl older than herself, who had since died, in charge of the premises. About 2 o'clock on that evening, a Mexican man named "Parse," who was then living on the defendant's place, brought a beef to the house, which he penned in the cow-pen, killed and butchered, and afterwards hung the butchered meat in the defendant's smoke-house. Defendant and his wife returned home about sundown, when the Mexican, in witness's presence, told the defendant that he had got and butchered a beef, and stored the meat in the smoke-house. Defendant in reply told Parse that he did very wrong to kill that beef. Witness lived at the defendant's house, and was there on the next morning when General Saffold and others came and examined the premises. Sev-

eral Mexicans came to the house while the party was there, and were arrested by General Saffold. " Parse " was among those arrested. The Mexicans so arrested were all released by General Saffold. Parse had lived with the defendant about a year prior to the killing of the beef. Witness had been married about seven years, but did not know her age. Defendant left home a short time before the arrival of General Saffold and his party. Witness did not know why he left. At the time of the killing of the beef, Parse was, and had been for a week, constructing a new picket-fence around the defendant's garden. Parse had but one eye.

General Saffold, Barrington and Wooldridge were, in the order named, recalled by the State in rebuttal. Each testified that the witness Lotta was not at the defendant's house on the morning the same was examined as related in the preceding testimony of each; that no one but defendant's wife was at the house; that there was no new picket fence in course of construction around the defendant's garden, or around any other piece of ground on his premises; that neither of the two Mexicans who came to the house, and were arrested and released, during the investigation, had lost an eye, but that both had unblemished eyes. Wooldridge testified that he knew the one-eyed Mexican, Parse, well; that the said Parse had not lived at defendant's house during the previous year, nor had he, to the witness's knowledge, worked there during the previous week. The said Parse was not one of the Mexicans arrested and released by General Saffold, as stated by the witness Lotta Herron.

The State next introduced in evidence the *capias* showing the arrest of the defendant upon this indictment, in 1881, by Sheriff Dunn, of Guadalupe county; the record entry of his recognizance to appear before the district court for trial, the judgments *nisi* and final forfeiting his recognizance, and the *capias* showing his re-arrest in 1885 by Sheriff McGuffin.

The motion for new trial raised the question discussed in the opinion.

*Rust & Ehringhaus* and *W. H. Burges*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

Willson, Judge. A witness in behalf of defendant testified that the beef steer was brought to defendant's house in his absence, butchered, and the meat placed in defendant's smoke-house, by a Mexican named " Parse." In his charge to the jury, the trial judge

did not affirmatively instruct with reference to the phase of the case presented by this testimony. To supply this omission in the charge, defendant's counsel requested the following instructions, viz.:

"1st. To convict the defendant in this case the evidence must show to your satisfaction, beyond a reasonable doubt, that the defendant took, or was concerned in taking, the animal named in the indictment; that is to say, he must have been concerned in the original taking from the possession of the owner; for, if the evidence shows that another person took said animal and put or left it in possession of the defendant, the defendant cannot, under the indictment in this case, be convicted, and if he was not concerned in the original taking it is your duty to acquit.

"2d. Theft and receiving goods or property knowing the same to have been stolen are two different offenses, and a person cannot be tried for one and convicted of the other. Therefore, if the Mexican 'Parse,' or any one else, took the animal named in the indictment, and the defendant did not assist in the taking, he cannot in this case be convicted, though he received, hid, and used the animal so taken, though he knew it was stolen; and in such case, or if you have a reasonable doubt on this point, you should acquit the defendant."

The court refused to give these or any other similar instructions. We must hold that this was error, for which the conviction must be set aside. The requested instructions were demanded by the evidence, and embodied the law applicable to the particular phase of the case presented by the testimony of the witness before referred to. It was not for the trial judge, or for this court, but for the jury alone, to pass upon the credibility of this testimony. It was the imperative duty of the court to submit to the jury, affirmatively, the law applicable to such testimony, leaving to the jury the duty of determining the credibility of the witness and the weight to be accorded her statements. (*White* v. *The State*, 18 Texas Ct. App., 57.)

Several other supposed errors are complained of by counsel for defendant, but, if they be errors, they are of a character not likely to occur on another trial, and we will not take time to consider them. Because of the error of the court in failing to instruct the jury as requested by defendant, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Opinion delivered February 13, 1886.]